Filed 7/21/26  In re Z.R. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.R., a Person Coming Under the Juvenile Court Law. | B347170<br><br>(Los Angeles County<br>Super. Ct. No. 17CCJP02808C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>JOSHUA T.,<br><br>       Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee. Affirmed.

James W. Tritt, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Joshua T. (father) challenges the juvenile court's order asserting dependency jurisdiction over his son, Z.R., under Welfare and Institutions Code section 300, subdivision (b).[1]  The sustained dependency petition alleged that mother had a history of substance abuse that rendered her incapable of providing Z.R. and his half brother, J.R., with regular care and supervision.[2]  The petition also alleged that father had failed to comply with court orders from a prior dependency proceeding and had not mitigated the risks from his prior domestic violence against mother.  On appeal, father contends the evidence was insufficient to support the jurisdictional findings.  We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prior Dependency Proceedings

In March 2017, the Los Angeles County Department of Children and Family Services (DCFS) received a referral concerning neglect as to J.R.  The caller reported that J.R. lived with his maternal grandmother; father often beat mother at maternal grandmother's home; and mother and father left J.R. with maternal grandmother two weeks earlier and had gone "to

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.  Mother is not a party to this appeal.

[2]     Although we discuss relevant evidence and allegations concerning J.R., this appeal concerns only Z.R.

2

an unknown destination."[3]  In December 2017, DCFS received another referral concerning J.R. and Z.R., who was then a newborn.  The caller reported that father was "non-compliant with the ongoing case plan."  Mother was reportedly afraid of father because of previous domestic abuse.

In 2018, the juvenile court sustained a dependency petition alleging that father's domestic abuse of mother placed J.R. and Z.R. at substantial risk of harm.  The court found true allegations that mother and father had a history of domestic violence, including an incident in 2017 in which father pushed mother to the ground, repeatedly hit and bit her, and covered her mouth to prevent her from calling for help.  The court found that father's violent conduct against mother, and mother's failure to protect J.R. from father, placed J.R. and Z.R. at substantial risk of suffering serious, nonaccidental physical harm.  (§ 300, subds. (a), (j).)  The court also sustained an allegation that mother's alcohol abuse rendered her unable to provide the children with regular care and supervision.  (*Id.*, subds. (b), (j).)

The juvenile court ordered father to complete a 52-week domestic violence program, parenting education, and individual therapy to address domestic violence and anger management.  A status review report from 2018 indicates that father informed his social worker that he was discharged from a domestic violence program for poor attendance and had not provided verification of his reenrollment.

In 2019, the juvenile court terminated dependency jurisdiction and awarded mother sole legal and physical custody

---

[3]     Father was arrested in 2017 for inflicting corporal injury on a spouse or cohabitant.  The record does not indicate whether the arrest led to any criminal charges.

3

of the children. The court ordered that father's visits with Z.R. were to be monitored and could not take place in mother's home.

In November 2024, DCFS received a referral regarding Z.R. Z.R. was reportedly present during a domestic violence incident between father and his girlfriend. Father and the girlfriend pushed each other, father stabbed her with a pen, and father "poked her and scratched her on her back and side." Z.R. heard but did not see the incident. Father was arrested and charged with inflicting corporal injury on a cohabitant and preventing and dissuading a victim from reporting a crime. Father's girlfriend obtained a criminal protective order against father. In March 2025, the charges were dismissed on speedy trial grounds.

***2025 Investigation and Initial Hearing***

In February 2025, DCFS received another referral regarding J.R. and Z.R., now ten and seven years old, respectively. The reporting party suspected that mother had relapsed and was abusing drugs. Mother had been seen in an area known for drug sales. The reporting party did not know if mother had the children with her or left them alone and unsupervised at the motel where they were living.

In the ensuing investigation, DCFS learned mother lived with maternal grandmother and maternal aunt until October 2024. Maternal aunt and maternal grandmother reported that mother exhibited aggressive behavior at home. Mother would often go out, leaving the children at home, and return intoxicated. Maternal aunt obtained a restraining order against mother in October because mother threatened to fight her after maternal aunt told her to leave maternal grandmother's home due to her behavior. Mother had previously rented a room from maternal grandmother's friend. Maternal grandmother learned

4

that mother stole from the friend's home and had returned to the house intoxicated several times.

Maternal aunt and maternal grandmother heard from "multiple sources" that mother was currently abusing substances. They believed mother's substance abuse was consistent with her recent aggression. Maternal aunt also said both children mentioned that mother and her friends "do 'things' " in the bathroom at the motel. Maternal grandmother told a social worker that mother attended Alcoholics Anonymous in middle school and relapsed around the time Z.R. was born in 2017.

According to maternal aunt and maternal grandmother, when mother came to pick the children up from maternal grandmother's house, the children often did not want to leave with her. On one occasion, Z.R. said he did not want to leave with mother because she did not feed him. Maternal aunt was unsure if Z.R. made the comment just to indicate he did not want to go with mother and she was unable to ask additional questions. Maternal grandmother had to pick up the children from school on multiple occasions because mother had to "travel[ ] hours away for work." Maternal grandmother believed this was inconsistent with mother's claim that she cleaned houses for a living.

A counselor at the children's elementary school was assigned to work with the family due to the children's chronic absences. Z.R. had 69 tardies and 14 absences, and J.R. had 37 tardies and 11 absences. The counselor attempted to contact both parents, but father did not respond, and mother was evasive and difficult to reach. Both children were "present and on time" when in maternal grandmother's care.

Mother initially denied any substance abuse or use. She attributed the children's tardiness and absences from school to her not having a car, a recent move, or other causes. Mother also admitted that maternal aunt and maternal grandmother kicked her out of the house. Mother said this happened because she " 'was going out a lot' " and it upset them. She also admitted that J.R. had refused to leave maternal grandmother's house and return to mother in the past. Mother relied on maternal grandmother for "tasks involving the children" and she felt that maternal grandmother had "influence" over matters concerning them. This led to tension between mother and maternal grandmother. J.R. told a social worker that mother and maternal grandmother " 'don't talk to each other.' "

In February 2025, mother tested positive for methamphetamine. She denied methamphetamine use and refused to discuss services.

One month later, maternal grandmother told a social worker she believed mother was "doing much worse." The children had stayed with maternal grandmother several times over the prior month. J.R. still sometimes refused to return to mother. Mother called maternal grandmother twice since her positive drug test because she did not have money for food. After the first call, maternal grandmother dropped off food at the motel for mother and the children. Mother called maternal grandmother several days later to ask for cash and hung up when maternal grandmother refused. Mother confirmed that she had recently asked maternal grandmother for money for food. Although she did not want the children removed from her, she preferred that they remain with maternal grandmother.

The investigation also revealed that Z.R. had been regularly visiting father every one or two weeks for variable periods, sometimes days at a time. Mother believed father lived with paternal grandmother, but she did not speak to father, did not know where he lived, and claimed she did not have his or paternal grandmother's contact information. She knew father did not complete his court-ordered classes and that he was supposed to have monitored visits with Z.R. Mother did not explain how she ensured Z.R.'s visits with father were monitored. She was not aware of the 2024 domestic violence incident between father and his girlfriend. Paternal grandmother reported that father lived with his girlfriend and sometimes came to her house with Z.R. She was not present in 2024 during the incident that led to father's arrest for domestic violence.

On March 25, 2025, DCFS detained the children from mother pursuant to a removal order and placed them with maternal grandmother. J.R. told a social worker he believed his mother had "ongoing issues" and needed help.

On March 27, 2025, DCFS filed a section 300 petition. The petition alleged that J.R. and Z.R. were at substantial risk of serious physical harm because mother's abuse of alcohol, marijuana, and methamphetamine rendered her incapable of providing the children with regular care or supervision. (§ 300, subds. (b)(1)(A), (D), (j).) Father was not named in the petition. At the initial hearing, the juvenile court detained Z.R. and J.R. from mother and their respective fathers. The court ordered DCFS to provide family reunification services and monitored visits for mother and monitored visits for father as to Z.R. The court ordered that father be provided with domestic violence referrals so that he might "complete his prior orders."

***Further Investigation***

In April 2025, when an investigating social worker read the petition's allegations to mother, she responded, " 'It is true. It is all true.' " Mother admitted her past alcohol abuse and her recent use of methamphetamine, which led to the positive test result. She had started using methamphetamine two years earlier and used it monthly. She admitted that she abused alcohol, marijuana, and, more recently, methamphetamine, as a coping mechanism when she was overwhelmed. When she used substances, she left the children in the care of maternal grandmother and would " 'leave without saying anything.' "

Mother had again tested positive for methamphetamine in April 2025. She admitted that she used methamphetamine the day of the drug test because she was upset about losing a friend. Mother's substance abuse counselor reported that mother had missed several sessions of her substance abuse program in April and was warned that she would be discharged for noncompliance. Mother later told her substance abuse counselor that she recently relapsed and wanted to remain in the program.

Maternal grandmother told the investigating social worker that mother had started drinking in middle school. Mother improved after attending treatment but worsened after father's abuse. Because mother left home and returned intoxicated when she lived with maternal grandmother, and later with maternal grandmother's friend, maternal grandmother and maternal aunt were concerned that mother was leaving the children unsupervised at the motel. Maternal aunt reported that mother drank, used marijuana, and on one occasion, asked maternal aunt to search her purse for " 'a little baggie with white

8

substance,' " which led maternal aunt to believe mother was using illegal drugs as well.

When questioned by the social worker, J.R. said he did not feel safe or comfortable returning to mother. He said that to feel safe returning to mother, she would have to stop drinking. J.R. explained that " '[w]hen [mother] drinks, she just falls asleep and doesn't want to get up or do anything.' " Z.R. said he did not know what drugs are. He admitted he had refused to return to the motel, but said that was because it was boring. However, when asked where he felt most comfortable and safe, Z.R. replied that he wanted to visit father and mother but wanted to remain at maternal grandmother's home. Both children told the social worker they did not want to return to mother at the motel.

Mother confirmed that father did not complete any of the classes the juvenile court ordered in 2018. Mother knew that the court ordered father to have monitored visits with Z.R., but she moved in with father after the case closed. After mother separated from father, she would drop Z.R. at paternal grandmother's home every other weekend for visits with father.

The investigating social worker also interviewed father. When asked about the 2017 domestic violence incidents, father said that it " 'was many years ago' " and he was " 'much younger and immature.' " He admitted that he did not participate in the court-ordered classes and programs. Father stated, " 'It is going to sound bad, but I just did not have the time to be doing all that. . . . I did not make that my priority and did not want to deal with it.' " Father denied that he was the aggressor in the domestic violence incidents. He stated that he only would " 'bear hug' " mother when she became violent after drinking to stop her from hurting herself. He explained: "Maybe I did leave bruises

9

on her from holding her down because she is big, I needed to use my strength to stop her from making a scene." The social worker asked father about the 2024 domestic violence incident with his girlfriend. Father said, " 'Well what it says there is what happened. That is all that happened.' "

On May 2, 2025, DCFS filed a first amended petition adding the allegation that mother and father's failure to comply with the previous orders of the juvenile court placed Z.R. at a substantial risk of harm under section 300, subdivision (b)(1). The petition alleged that father failed to complete court-ordered classes and therapy to address anger management and domestic violence, and father had unmonitored contact with Z.R. Soon after the petition was filed, father enrolled in parenting and domestic violence classes.

### *Jurisdiction and Disposition Hearing*

At the May 28, 2025 hearing, the juvenile court sustained the petition as pled. The juvenile court declared Z.R. a dependent of the court, found by clear and convincing evidence that there was "a substantial danger to [Z.R.'s] physical and mental well-being," and ordered him removed from mother and father. The court found the current placement with maternal grandmother was appropriate. The court ordered DCFS to provide family reunification services and monitored visits for both parents. Father was ordered to complete a 26-week domestic violence program for batterers and parenting education classes.

Father timely appealed.

## DISCUSSION

### I.    Legal Principles and Standard of Review

As relevant here, section 300, subdivision (b)(1) authorizes dependency jurisdiction if a child "has suffered, or there is a

10

substantial risk that the child will suffer, serious physical harm or illness, as a result of" a parent's "failure or inability . . . to adequately supervise or protect the child" and "inability . . . to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1)(A), (D).) Subdivision (j) authorizes dependency jurisdiction when a child's sibling has been abused or neglected and there is a substantial risk the child will similarly be abused or neglected.

To establish that dependency jurisdiction is warranted under section 300, subdivision (b)(1), the child welfare agency must prove: (1) the parent's neglectful conduct, or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.) If the agency alleges substantial risk, the risk to the child "must exist ' "at the time of the jurisdiction hearing." ' [Citations.]" (*In re J.N.* (2021) 62 Cal.App.5th 767, 775.) "To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]' [Citation.]" (*In re D.L.*, at p. 1146.) However, "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.)

" 'In reviewing the jurisdictional findings . . ., we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note

11

that issues of fact and credibility are the province of the trial court.' [Citations.]" (*In re R.T.* (2017) 3 Cal.5th 622, 633.) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

## II. Substantial Evidence Supports the Trial Court's Jurisdictional Findings

### A. Mother's conduct

Father contends that mother's conduct failed to provide a basis for jurisdiction under section 300, subdivision (b). He argues there was no evidence that mother's "occasional methamphetamine use" rose to the level of substance abuse or created a risk of harm to Z.R. We reject the argument. Father's contention relies on a selective view of the jurisdictional findings and ignores the considerable evidence that mother's substance abuse significantly impaired her ability to care for Z.R.

Section 300, subdivision (b), authorizes dependency jurisdiction where a parent's substance abuse—the excessive use of drugs or alcohol—renders the parent unable to regularly care for a child. (*In re N.R.* (2023) 15 Cal.5th 520, 540.) "The finding of dependency cannot be based on substance abuse alone; jurisdiction requires a substantial risk of harm to the child arising from the substance abuse." (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.)

Mother's use of methamphetamine was not the sole basis for jurisdiction. The juvenile court sustained the allegation that mother's use of alcohol, marijuana, and methamphetamine created a risk of harm to Z.R. Mother became dependent on alcohol when she was a minor. She admitted that she used

12

alcohol, marijuana, and methamphetamine to cope with hardships, including when she left father three years earlier and when she was kicked out of maternal grandmother's home in 2024. She tested positive for methamphetamine twice before the jurisdiction and disposition hearing. Maternal grandmother and maternal aunt reported that while mother was living with maternal grandmother, she would leave without warning and return intoxicated and aggressive, leading maternal aunt to seek a restraining order. At a prior residence, she also returned to the home visibly intoxicated and stole from the landlord.

Further evidence supports the conclusion that mother's substance abuse rendered her unable to adequately care for Z.R. Maternal grandmother and maternal aunt reported that when mother lived with them, she disappeared for hours or days without making plans for childcare, informing her family where she was going, or letting them know when she would return. Mother admitted that she went out " 'a lot' " and left her children at maternal grandmother's home without saying anything. The maternal relatives were justifiably concerned that this pattern continued when mother and the children were living in a motel room.

Additional evidence suggested other manifestations of neglect. The children told maternal relatives that they were present when mother "did things" with her friends in the bathroom of the motel. J.R. told a social worker that when mother drank, she fell asleep and would not get up to do anything. Z.R. told the maternal aunt that mother did not always feed him. The children were frequently late or absent from school. Mother was evasive and nonresponsive when a school counselor attempted to contact her. The juvenile court

could reasonably infer that this conduct was the result of mother's substance abuse.  (See *In re Natalie A.* (2015) 243 Cal.App.4th 178, 185 [juvenile court could infer nexus between drug use and failure to care and supervise where father left children with paternal grandparents to smoke marijuana]; cf. *In re L.G.* (2026) 118 Cal.App.5th 1208, 1227 [evidence that mother with mental illness lived alone, "lacked a second caregiver" and "was alienated from maternal grandparents, who had previously provided significant support" created risk of harm].)

Father cites *In re L.C.* (2019) 38 Cal.App.5th 646, to support his contention that mother's substance abuse did not place Z.R. at harm.  *L.C.* does not aid his argument.  The court in *L.C.* reversed jurisdictional findings based on a guardian's sporadic use of methamphetamine because the drug use did not interfere with his care of the child.  He dropped the child off and picked her up from school every day, took her to medical appointments, and helped her with homework.  (*Id*. at pp. 652, 653.)  Further, after the initiation of the dependency action, the guardian stopped using drugs, arranged his own drug tests, and enrolled in substance abuse classes before the jurisdictional hearing.  (*Id*. at p. 653.)

Here, there is no similar evidence that mother reliably met Z.R.'s daily needs.  Both of mother's children expressed an unwillingness to live with mother and made statements indicating she was unable to adequately care for them.  Moreover, unlike the guardian in *L.C.*, mother was unable to mitigate her drug use before the jurisdiction hearing.  She initially denied her substance abuse and, despite DCFS involvement, continued to use substances.  Indeed, mother told a social worker that everything in the detention report was true.

14

Substantial evidence supported the juvenile court's conclusion that mother's substance abuse created a risk of serious physical harm to Z.R.[4]

## B. Father's conduct

Father further contends that the evidence was insufficient to support the jurisdictional finding that his conduct created an ongoing risk of harm to Z.R. Because jurisdiction was proper based on mother's conduct, we need not consider whether it was also proper based on father's conduct. (*In re J.C.* (2014) 233 Cal.App.4th 1, 3.) We nevertheless exercise our discretion to reach the merits of father's contention and conclude substantial evidence supported the juvenile court's finding. (*Id.* at p. 4.)

It is undisputed that father's custody and visitation were limited due to the domestic violence allegations found true in the prior dependency proceeding, and the risk father's conduct posed to Z.R. that had not been ameliorated by the time the case closed. It is further undisputed that father had not participated in the services ordered in the prior proceeding, which were intended to allow him to safely reunify with Z.R. DCFS's investigation in 2025 revealed that father did not acknowledge the seriousness of his past conduct, the court's prior orders, or his failure to participate in services. He admitted that he did not enroll in counseling because he did not prioritize it or " 'want to deal with it.' "

---

[4] Having concluded that substantial evidence supports the trial court's exercise of jurisdiction under section 300, subdivision (b), we need not separately address father's contention that insufficient evidence supported a finding of jurisdiction under subdivision (j). (*In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 ["Section 300 contemplates that jurisdiction may be based on any single subdivision."].)

15

Father additionally minimized his past domestic violence toward mother.  Yet, he admitted that during an unmonitored visit with Z.R. in 2024, he engaged in a violent incident with a girlfriend.  Father did not deny the allegations that he poked, scratched, and stabbed the girlfriend with a pen, leading her to obtain a criminal protective order against him.  Although father claimed the incidents with mother happened when he was much younger and immature, the far more recent incident with another romantic partner, when Z.R. was in his care, was an indication that father's conduct was not significantly changed.  As such, the juvenile court could reasonably conclude that father's failure to comply with the previous juvenile court orders placed Z.R. at substantial risk of suffering serious physical harm.  (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1125 [mother's violation of order requiring monitored visits and "no indication mother understood or accepted the seriousness of violating a court order" supported § 300, subd. (b)(1), jurisdiction]; see also *In re D.B.* (2020) 48 Cal.App.5th 613, 622 [affirming jurisdiction finding where father "gave no sign he would change his conduct" towards daughter]; *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision' "].)

Father's reliance on *In re Jesus M.* (2015) 235 Cal.App.4th 104 (*Jesus M.*), is misplaced.  In *Jesus M.*, the appellate court reversed a juvenile court's jurisdictional order under section 300, subdivision (b), because the lower court concluded the father's repeated violations of a restraining order caused emotional and not physical harm to the children.  (*Jesus M.*, at p. 112.)  Since the juvenile court expressly rejected domestic violence as a basis

16

for jurisdiction and solely relied on the father's violation of the restraining order, the reviewing court determined it could not affirm the juvenile court order based on evidence of the father's past domestic violence. (*Ibid*.) Although the *Jesus M.* court also observed that any past domestic violence between the parents was remote in time and there was no evidence that the father was still violent, those observations were not the basis for the court's ultimate holding.

Here, the evidence of domestic violence was not remote, and the circumstances differ significantly from those presented in *Jesus M.* In this case, there was a prior sustained dependency petition, there were existing juvenile court orders intended to eliminate the risk of harm to Z.R., father failed to comply with those orders, and father engaged in domestic violence against another partner while Z.R. was in his care, indicating an ongoing risk of Z.R. suffering serious physical harm as a result of father's conduct. In *Jesus M.*, the juvenile court found only a risk of emotional harm, and, at the end of the opinion, the court suggested the "[m]other was not without options other than resort to dependency proceedings" to address the father's violations of a restraining order. (*Jesus M.*, *supra*, 235 Cal.App.4th at p. 113.) In this case, there was no other party who might take steps to protect Z.R. from the effects of father's conduct.

Substantial evidence supported the juvenile court's jurisdictional findings based on father's conduct.

## DISPOSITION

The juvenile court's order is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ADAMS, J.

We concur:

EGERTON, Acting P. J.

OCHOA, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.